THIS DISPOSITION IS
CITABLE AS
PRECEDENT OF THE TTAB

Mailed: April 24, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Mark Thomas
_____

Serial No. 78334625
_____

Patricia S. Kramer of Walker & Jocke for Mark Thomas.

Rebecca L. Gilbert, Trademark Examining Attorney, Law Office 104 (Chris Doninger, Managing Attorney).
_____

Before Seeherman, Bucher and Holtzman, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Mark Thomas has filed an application to register the mark MARCHE NOIR (in standard character form) for "jewelry" in International Class 14.[1] The application includes an English translation of MARCHE NOIR as "black market."

_____

[1] Application Serial No. 78334625, filed December 1, 2003, alleging dates of first use and first use in commerce on June 4, 1982.

The trademark examining attorney has refused registration under Section 2(d) of the Trademark Act on the ground that applicant's mark, when applied to applicant's goods, so resembles the marks in the following three registrations, the first two of which are owned by the same entity, as to be likely to cause confusion:

> Registration No. 2047169 of the mark shown below for "clothing for women, namely, dresses, pants, jackets, lingerie, tops, skirts, and shorts" in International Class 25;[2]

## BLACK MARKET

> Registration No. 2443749 of the mark **BLACK MARKET** for "jewelry; necklaces; earrings; watches; bracelets" in International Class 14;[3]

> Registration No. 1709522 for the mark **BLACK MARKET MINERALS** (MINERALS disclaimed) for "retail jewelry and mineral store services" in International Class 35.[4]

When the refusal to register was made final, applicant appealed. Briefs have been filed. An oral hearing was not requested.

---

[2] Issued to White House, Inc. on March 25, 1997; affidavits under Sections 8 and 15 accepted and acknowledged, respectively.

[3] Issued to White House, Inc. on April 17, 2001. This registration also includes goods in International Classes 3, 9, 18, 20, 21, 24, 25, 26, 28 and 35.

[4] Issued to Village Originals Inc. on August 18, 1992; renewed.

As a preliminary matter, we note applicant's argument that Registration No. 2443749 (BLACK MARKET) issued in error in Class 14 for jewelry. Applicant submitted portions of the file for that registration (the final refusal and applicant's request for reconsideration) showing that during prosecution of the underlying application, the Class 14 jewelry, as well as the word "jewelry," which was listed as a field in the Class 35 retail store services, had been deleted from the application by amendment in order to overcome a Section 2(d) refusal as to those classes. Despite the deletion, however, the registration issued in Class 14. The Office records have now been corrected, and Class 14 no longer appears in the registration. Accordingly, the refusal as to this registration is moot.

We also note that applicant filed a main brief that is 29 pages long in violation of the 25-page limit for appeal briefs set forth in Trademark Rule 2.142(b)(2). The rule clearly states that "[w]ithout prior leave of the Trademark Trial and Appeal Board, a brief shall not exceed twenty-five pages in length in its entirety, including the table of contents, index of cases, description of the record, statement of the issues, recitation of the facts, argument, and summary." See also TBMP §1203.01 (2d ed. rev. 2004). Applicant did not request leave of the Board to

file a brief that exceeds the page limit. Accordingly, applicant's main brief has not been considered.[5]

We turn then to the merits of this case. Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue, including the similarities of the marks and the similarities of the goods and/or services. In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

## Registration No. 1709522

We first consider the refusal with respect to Registration No. 1709522 of the mark BLACK MARKET MINERALS (MINERALS disclaimed) for "retail jewelry and mineral store services." Applicant's goods are "jewelry." Registrant's services involve the retail sale of those goods. These are competitive, inherently related goods and services. See, e.g., Fortunoff Silver Sales, Inc. v. Norman Press, Inc., 225 USPQ 863, 866 (TTAB 1985) ("there is little question that jewelry store services and jewelry are highly related goods and services"); and In re Jewelmasters, Inc., 221 USPQ 90 (TTAB 1983). See also J. Thomas McCarthy, *Trademarks and Unfair Competition* §24:25 (2006) ("[w]here the services consist of retail sales services,

---

[5] We have, however, considered applicant's responses to Office actions and its reply brief.

likelihood of confusion is found when another mark is used on goods which are commonly sold through such a retail outlet.").

Because the goods and services are closely related, and there are no restrictions as to their channels of trade or classes of purchasers, they must be deemed to be promoted in the same channels of trade and directed to the same purchasers. Interstate Brands Corp. v. McKee Foods Corp., 53 USPQ2d 1910 (TTAB 2000).

Applicant, while noting that the jewelry associated with both marks is "relatively inexpensive," attempts to distinguish the nature of the goods as well as the purchasers for the goods. In particular, applicant argues that the website for BLACK MARKET MINERALS shows that the items sold under this mark are used as components for creating jewelry whereas, according to applicant, as shown on its website, applicant's jewelry is "counter-culture" or "Goth" style jewelry that would be purchased by those interested in that style.[6]

As our primary reviewing court has often stated, the question of likelihood of confusion is determined on the basis of the identification of goods and services set forth in the application and registration, rather than on the basis of what

---

[6] Applicant does not explain what exactly "Goth" jewelry is but we note the definition of "Goth" in *Microsoft Encarta College Dictionary* (2001) as meaning "fashion of dark clothes and makeup...characterized by black clothes, heavy silver jewelry, black eye makeup and lipstick, and often pale face makeup."

evidence might show the actual nature of the goods and services or purchasers to be. See J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991); and Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990). There are no limitations on the types of jewelry produced by applicant or sold in registrant's retail store. While the minerals purchased from registrant's store may be used by customers to create pieces of jewelry, the term "jewelry" itself in the identification encompasses all kinds and styles of jewelry, including fine jewelry and costume or "Goth" jewelry. Thus, whether or not registrant actually sells the same type of "Goth" style jewelry as applicant is immaterial.

Furthermore, the purchasers of at least costume items of jewelry are ordinary members of the general public. Considering that this type of jewelry, as applicant points out, is relatively inexpensive, it is therefore likely to be purchased casually and on impulse, thus increasing the risk of confusion. Kimberly-Clark Corp. v. H. Douglas Enter., Ltd., 774 F.2d 1144, 227 USPQ 541 (Fed. Cir. 1985).

It is clear that consumers would be likely to believe that jewelry on the one hand and retail stores selling jewelry on the other emanate from or are sponsored by the same source if such goods and services are sold under the same or similar marks.

Thus, we turn to the marks. The issues concerning the similarity of the marks and the similarity of the goods and services are interrelated. When goods and services are highly related, "the degree of similarity necessary to support a conclusion of likely confusion declines." Shen Manufacturing Co., Inc. v. The Ritz Hotel Limited, 393 F.3d 1238, 73 USPQ2d 1350, 1354 (Fed. Cir. 2004).

The mark in Registration No. 1709522 is BLACK MARKET MINERALS. Applicant's mark is MARCHE NOIR, a French term which applicant has translated into English as "black market." Under the doctrine of foreign equivalents, foreign words from common languages are translated into English to determine similarity of connotation with English word marks. See Palm Bay Import, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The doctrine is applied when it is likely that "the ordinary American purchaser would 'stop and translate [the term] into its English equivalent.'" *Palm Bay*, supra at 1696, quoting In re Pan Tex Hotel Corp., 190 USPQ 109, 110 (TTAB 1976).

Applicant points to a printout from the website of *www.ethnicharvest.org* purporting to show figures for the 1990 U.S. Census, and indicating that 1,544,454 of the 230,445,777 individuals in the United States speak French "very well" or "well." Applicant reasons that because this figure represents

only 0.6% of the population, it is unlikely that the "average American buyer" will translate the mark MARCHE NOIR as required by *Palm Bay* because the evidence shows that the average American buyer does not speak French.

The "ordinary American purchaser" in this context refers to the ordinary American purchaser who is knowledgeable in the foreign language. See *Trademarks and Unfair Competition,* supra at 23:26 (4th ed.) ("The test is whether, to those American buyers familiar with the foreign language, the word would denote its English equivalent."). See also, e.g., Nestle's Milk Products, Inc. v. Baker Importing Company, Inc., 182 F.2d 193, 86 USPQ 80, 82 (CCPA 1950) ("Foreign language words, not adopted into the English language, which are descriptive of a product, are so considered in registration proceedings despite the fact that the words may be meaningless to the public generally."). We recognize that the doctrine is not an absolute rule, but applicant's interpretation of it would write the doctrine out of existence. In fact, this very argument was rejected in In re Ithaca Industries, Inc., 230 USPQ 702, 703 (TTAB 1986) where, in response to applicant's argument that, in effect, the doctrine of foreign equivalents is not applicable where the foreign word is in Italian, the Board said "it does not require any authority to conclude that Italian is a common, major language in the world and is spoken by many people in the United States." French is a

common foreign language spoken by an appreciable segment of the population.  Indeed, applicant's own evidence shows that of the foreign languages with the greatest number of speakers in the United States, French is ranked second only to Spanish.

Applicant also argues that an analysis of the marks requires more than simply the literal translation of MARCHE NOIR. Applicant contends that when MARCHE NOIR and BLACK MARKET MINERALS are compared in their entireties, the two marks are not at all similar in sound or appearance, and moreover that the connotations of the two marks are different.[7]  Relying on dictionary entries from *www.wordreference.com*, applicant notes that the word "marche" in French can be translated to mean "deal" or "dealing."  Applicant has also submitted a printout of Registration No. 2129644 for the mark THE BON MARCHE pointing out that the translation is listed as "good bargain."  In addition, applicant points to its website showing, according to applicant, that its goods are substantially counter-culture or "Goth" jewelry and accessories.  Applicant concludes from the evidence that applicant's mark can have a connotation of a black/dark deal, a dirty deal, or a "deal with the devil."

When we evaluate the similarities between an English word mark and a foreign word mark, we must, as in the comparison of

---

[7] Applicant's arguments concerning the analysis used by the Japanese Trademark Office to determine the similarity of marks are not relevant.

two English word marks, consider the marks in their entireties in terms of sound, appearance, meaning and commercial impression. Here, we find that the marks BLACK MARKET MINERALS and MARCHE NOIR, while decidedly different in sound and appearance, have the same connotations. Applicant has translated its mark as "black market." We also take judicial notice of the translation of "marche noir" in both *Cassell's French-English English-French Dictionary* (1951) and *Collins French Dictionary* (2000) as "black market" with no other qualifying information for either term.[8] MARCHE NOIR is the exact French equivalent of the English idiom BLACK MARKET.

There may be different definitions and meanings associated with the individual words "marche" and "noir" or with "marche" combined with a different word such as "bon" (as in the registered mark THE BON MARCHE). However, none of those other meanings is relevant to a determination of the meaning of the unitary expression MARCHE NOIR. The evidence clearly shows that the one and only meaning of that phrase is "black market," and, without question, that is how it would be recognized and understood by the French-speaking public.

---

[8] The listings in these dictionaries show an accent over the letter "e" in "marche." However, the presence or absence of the accent does not affect the meaning or perception of the term "marche noir." As noted, applicant has translated its mark as "black market."

Thus, this case is distinguishable from In re Sarkli, Ltd., 721 F.2d 353, 220 USPQ 111, 112 (Fed. Cir. 1983), finding that none of the dictionary definitions showed "second chance" to be the exact translation of the French term "repechage." This case is also distinguishable from In re Pan Tex Hotel Corporation, 190 USPQ 109, 110 (TTAB 1976), which found that while LA POSADA may be literally translated as "the inn," the various dictionary definitions made it clear that the designation had a "connotative flavor" which was slightly different from that of the words "the inn.").

Moreover, MARCHE NOIR and BLACK MARKET MINERALS not only have the same literal meaning, but they create the same overall commercial impression in relation to the respective goods and services, both marks suggesting contraband or illicit goods. To whatever extent MARCHE NOIR suggests a "Goth" connotation for applicant's jewelry, BLACK MARKET MINERALS conveys that same suggestive meaning for the jewelry sold in registrant's retail store.[9] Nor does the additional word MINERALS in registrant's mark serve to distinguish the marks. This word, which has been disclaimed, is descriptive of the components of jewelry, and

---

[9] Contrary to applicant's contention, it is not necessary that a consumer believe that the owner of one mark would also use the foreign equivalent in order to support a finding of likelihood of confusion. It is sufficient that consumers would assume that applicant's jewelry is in some way endorsed or approved by the owner of the English word mark for jewelry store services or that there is otherwise some connection between them.

therefore is entitled to less weight when we compare the marks. See In re National Data Corp., 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985). It certainly does not change the meaning or commercial impression conveyed by BLACK MARKET alone. The term, if anything, reinforces that impression.

We find, in view of the foregoing, not only that the French term MARCHE NOIR is the exact translation of "black market," but further that the mark would be translated by those who are familiar with the French language. This situation, thus, differs from those cases in which it was found that the mark would not be translated because of the inherent nature of the mark. Cf. In re Tia Maria, Inc., 188 USPQ 524 (TTAB 1984); and Le Continental Nut Co. v. Le Cordon Bleu S.A.R.L., 494 F.2d 1395, 181 USPQ 646 (CCPA 1974) (finding that CORDON BLUE, while literally translated as BLUE RIBBON, would not be translated by the American public because the two terms create different commercial impressions, CORDON BLEU having been adopted into the English language and acquiring a different meaning than BLUE RIBBON). Nor is this a situation where the mark would not be translated because of marketplace circumstances or the commercial setting in which the mark is used. Cf. In re Pan Tex Hotel Corporation, supra; and In re Tia Maria, Inc., supra (finding it unlikely that a person who had purchased AUNT MARY'S canned fruits and vegetables from a supermarket would, upon dining at the TIA MARIA restaurant

12

surrounded by Mexican décor and serving Mexican food, translate TIA MARIA into AUNT MARY and then mistakenly assume that both goods and services originated from the same source.)

Applicant argues that registrant's mark BLACK MARKET MINERALS is weak in view of the number of registrations containing the term BLACK MARKET and the common use of that term on the Internet. In addition to the three registrations cited against applicant's mark, applicant notes that yet a fourth registration (Registration No. 2327957) for BLACK MARKET owned by a different entity, Amsterdam Art, Inc., exists on the register. That registration is for retail services featuring artistic materials for painters. Applicant also states that his search on the Google search engine retrieved over 70,000 hits for "black market" and "jewelry" but only 1,020 hits for "marche noir" and "jewelry" and he has submitted a four-page printout of website summaries from that search. According to applicant, the summaries show that "black market" jewelry is "associated with a number of different websites" whereas MARCHE NOIR is associated only with applicant's jewelry.

We point out that the factor to be considered in determining likelihood of confusion under *du Pont* is the "number and nature of similar marks in use on similar goods." (Emphasis added.) See In re E. I. du Pont de Nemours & Co., supra at 567. There are a number of problems with applicant's showing in this regard.

13

First, third-party registrations are not evidence of use of the marks shown therein or that the public is aware of them. See AMF Inc. v. American Leisure Products, Inc., 474 F.2d 1403, 177 USPQ 268 (CCPA 1973); and Charrette Corp. v. Bowater Communication Papers Inc., 13 USPQ2d 2040 (TTAB 1989). Further, the third-party registration of BLACK MARKET for artist supplies, goods completely dissimilar to jewelry, is irrelevant to the question of whether the marks applied to the goods and services involved in this case are likely to cause confusion.[10]

Applicant's evidence of use is similarly unpersuasive. The number of Google hits for "black market" with jewelry, without any context for the hits, is irrelevant. Further, some of the website summaries in the list are so abbreviated that the context of use, such as the specific nature of the business or the particular goods or services offered on the various websites or in connection with the term "black market," is unclear. See In re Fitch IBCA, Inc., 64 USPQ2d 1058 (TTAB 2002); and TBMP §1208.03 (2d ed. rev. 2004). Still other summaries contain

---

[10] Applicant also argues that Registration No. 2327957 which issued to Amsterdam Art, Inc. was not cited by the examining attorney, and "was allowed to register for competitive (or at least related goods)" despite the existence of Registration No. 2443749 for "picture frames" (the registration cited herein with respect to items of jewelry in Class 14). Applicant contends that there is less similarity between applicant's goods and those of the cited marks than there is between the goods associated with the cited marks and those identified in Reg. No. 2327957. Suffice it to say that the similarity of the cited marks to each other or to yet another third-party registration is irrelevant to the question of whether there is a likelihood of confusion herein.

14

irrelevant usage of "black market" having nothing to do with jewelry (e.g., "black market adoption" and "black market dealings"). To the extent, if any, that jewelry is offered on certain websites in connection with "black market," we have no information about the entities offering those goods or services. The users may be affiliated with one of the cited registrants. In any event, without evidence as to the extent of third-party use, such as how long the websites have been operational or the extent of public exposure to the sites, the probative value of this evidence is minimal. See *Palm Bay Imports, Inc.*, supra.

While we have no evidence that registrant's mark is strong in terms of market strength, the mark by its nature is relatively strong. Moreover, there is no persuasive evidence of record that the term is commonly used in the jewelry field, or any other evidence to show that the mark is weak, or entitled to less than a normal scope of protection.[11] The single third-party registration for BLACK MARKET, discussed above, is not sufficient to show that the term has a suggestive significance for jewelry. Further, even if we were to assume some suggestiveness of the mark, and therefore a more limited scope of protection, the

---

[11] It appears that applicant contends that the absence of evidence of fame of the registrant's mark should be treated as a factor in applicant's favor. Because this is an ex parte proceeding, we would not expect the examining attorney to submit evidence of fame of the cited mark. This du Pont factor, as is normally the case in ex parte proceedings, must be treated as neutral.

protection to be accorded the cited registration still would extend to prevent the registration of a mark with the same connotation for closely related goods.[12]

We realize that the similarity of connotation of the marks, in itself, is not determinative and that this factor must be weighed against the dissimilarities in sound and appearance of the marks and all the other relevant factors bearing on the likelihood of confusion. See In re Sarkli, Ltd., supra. However, when we consider the similarity in connotation of the marks, together with the relative strength of the mark, the close relationship of the goods and services and the inexpensive nature of the goods and the impulse nature of their purchase, these factors combine to outweigh the dissimilarities in the marks.

Thus, this case is distinguishable from the cases relied on by applicant which found that the differences in the marks when combined with other factors outweighed the similarity in connotation. See, for example, Horn's Inc. v. Sanofi Beaute, Inc., 963 F. Supp. 318, 43 USPQ 1008 (S.D.N.Y. 1997) (no

---

[12] A mark that is only somewhat suggestive is entitled to greater protection than a more highly suggestive mark. See, e.g., Andrew Jergens Co. v. Sween Corp., 229 USPQ 394, 396 (TTAB 1986) ("'GENTLE TOUCH,' while somewhat suggestive, must be considered a strong mark in view of the absence of any evidence showing third-party uses of similar marks in the same field"); In re Great Lakes Canning, Inc., 227 USPQ 483, 485 (TTAB 1985) ("the fact that a mark may be somewhat suggestive does not mean that it is a 'weak' mark entitled to a limited scope of protection"); and Husky Oil Co. of Delaware v. Huskie Freightways, Inc., 176 USPQ 351 (TTAB 1972).

likelihood of confusion between HERE & THERE for perfume and DECI DELA for publishing fashion magazines and consulting services to the fashion industry, based on the differences in the goods and the sophistication of the purchasers); In re L'Oreal S.A., 222 USPQ 925 (TTAB 1984) (no likelihood of confusion between HAUTE MODE for hair coloring cream shampoo, and HI-FASHION SAMPLER for finger nail enamel, in view of the degree of suggestiveness of the marks and the disparate nature of the goods); and In re Tia Maria, Inc., supra (no likelihood of confusion between TIA MARIA for restaurant services and AUNT MARY'S for canned fruits and vegetables, finding that the mark would not be translated, but rather would be accepted as it is, and in view of the differences in the goods and services).

We note that applicant owned a prior registration, now cancelled, for MARCHE NOIR for jewelry (Registration No. 2013903) and that the Office allowed that registration to issue over the now-cited registration for BLACK MARKET MINERALS. Applicant argues that the Office has already decided that there is no likelihood of confusion between these two marks and that it is inappropriate to deny registration when registration was not previously denied.

In connection with this point, applicant also contends that there has been no actual confusion between MARCHE NOIR and the cited mark despite contemporaneous use of these marks for fifteen

17

years. Applicant maintains that if there had been any confusion, registrant would have attempted to prevent the previous registration of applicant's mark or objected to its existence. To support these contentions, applicant, Mark Thomas, states in a declaration that he is not aware of any actual confusion. In addition, Mr. Thomas sent letters to the holders of both cited registrations inquiring as to whether the registrants were aware of any actual confusion between their marks and applicant's mark, and asking them to sign a sworn statement that they did not know of any actual confusion and that they have no objection to applicant's obtaining a registration. When applicant received no response to those letters, applicant sent follow-up letters stating that if he did not hear from the registrants within a certain time he would assume that they had no objection to the registration of applicant's mark.[13]

To begin with, the fact that the cited mark and MARCHE NOIR at one time coexisted on the register does not prove that they coexisted during that time without confusion in the marketplace. Further, our determination of likelihood of confusion must be based on the facts and record before us. We are not bound by the

---

[13] Applicant's contention that the USPTO permitted Registration No. 2443749 of BLACK MARKET (stylized) for jewelry to coexist with these other registrations is not accurate. The file for that registration shows that both BLACK MARKET MINERALS and MARCHE NOIR were cited as bars to registration of BLACK MARKET (stylized) in Class 14 for jewelry and Class 35 for retail jewelry store services. As a result, the goods

previous examining attorney's determination that applicant's mark was registrable, and we will not compound the problem of the registration of a confusingly similar mark by permitting such a mark to register again. See In re Nett Designs, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) (stating that "The Board must decide each case on its own merits" and specifically noting that "Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court."). See also In re Perez, 21 USPQ2d 1075, 1077 (TTAB 1991)("[W]e are, of course, not bound by an Examining Attorney's prior determination as to registrability"; refusal affirmed notwithstanding that the conflicting registration had not been cited against applicant's previous registration, now expired, of the same mark for the same goods.)

Further, applicant's unsupported allegation of long, contemporaneous use is of little persuasive value. Without evidence of the nature and extent of both applicant's and registrant's use of their respective marks, we cannot determine whether a meaningful opportunity for actual confusion ever existed. See Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d 1768 (TTAB 1992). Cf. In re General Motors Corp., 23 USPQ2d 1465

---

in Class 14 and the word "jewelry" in Class 35 were deleted. The registration has now been corrected to reflect this amendment.

(TTAB 1992). Nor will we infer from registrants' failure to respond to applicant's letters that registrants have consented to registration or that registrants have no objection to the registration of applicant's mark. The registrants clearly had no obligation to respond to applicant's inquiries. Therefore, their failure to respond does not support applicant's claim that they have no objection.

Similarly, we cannot conclude that registrant had no objection to applicant's earlier registration simply because registrant failed to object to it. We are not privy to registrant's reasons for not challenging the registration and we will not speculate about them. We do, however, note that any objections registrant may have had to applicant's earlier registration were eliminated once the registration was cancelled.

For the reasons stated above, we find that a likelihood of confusion exists between MARCHE NOIR for "jewelry" and BLACK MARKET MINERALS for "retail jewelry and mineral store services."

## Registration No. 2047169

We reach a different result as to the question of likelihood of confusion with respect to the mark BLACK MARKET (stylized) for "clothing for women, namely, dresses, pants, jackets, lingerie, tops, skirts, and shorts."

The examining attorney argues that jewelry and clothing are highly related goods and to support her position has made of

20

record several use-based, third-party registrations covering, in each instance, both types of goods.  Third-party registrations, while not evidence of use, may be used to show that the respective goods are of a type which may emanate from the same source.  See In re Albert Trostel & Sons Co., 29 USPQ2d 1783 (TTAB 1993).

While jewelry may be related to clothing, the goods are nevertheless specifically different.  We cannot conclude on the basis of the evidence of record that jewelry and clothing are so closely related that, notwithstanding the differences in the marks, purchasers would naturally expect these goods to emanate from the same source.  See In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993) ("The degree of 'relatedness' must be viewed in the context of all the factors, in determining whether the services are sufficiently related that a reasonable consumer would be confused as to source or sponsorship.").

Thus, although the marks have the same connotation, because of the cumulative differences in the respective marks and the goods offered thereunder, and the fact that the goods are not closely related, we cannot find likelihood of confusion with respect to this registration.[14]

---

[14] In making this determination, however, we have given no probative weight to applicant's evidence and arguments concerning the manner of

Ser. No. 78334625

**Decision:** The refusal to register under Section 2(d) of the Trademark Act is affirmed as to Registration No.1709522 and reversed as to Registration No. 2047169.

---

actual use of registrant's mark and applicant's contentions regarding the connotation of registrant's mark based on that use. It is well established that, in proceedings before the Board, as distinguished from infringement proceedings before the court, the question of likelihood of confusion must be decided on the basis of the mark as shown in the registration, regardless of how the mark is actually used. Kimberly-Clark Corp. v. H. Douglas Enterprises, 774 F.2d 1144, 227 USPQ 541 (Fed. Cir. 1985).